# 23-8083

## In the
## United States Court of Appeals
## For the Second Circuit

ROWE PLASTIC SURGERY OF NEW JERSEY, L.L.C. and
NORMAN MAURICE ROWE, M.D., M.H.A., L.L.C.,

*Plaintiffs-Appellants,*

– v. –

AETNA LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

MICHAEL BAGLIO
BRENDAN J. KEARNS
LEWIN & BAGLIO, LLP
*Attorneys for Plaintiffs-Appellants*
1100 Shames Drive, Suite 100
Westbury, New York 11590
(516) 307-1777
mbaglio@lewinbaglio.com
bkearns@lewinbalio.com


APPELLATE INNOVATIONS
(914) 948-2240

20724

# Table of Contents

Table of Authorities ................................................................................iv

Jurisdiction ......................................................................................... 1

Issues Presented: ...............................................................................3

   Consideration of the entirety of the AC ...........................................3

   Consideration of Documents Extraneous to the Amended
Complaint.............................................................................................3

     Industry Participants...........................................................4

     Underlying Errors ..............................................................4

   Statement of The Case.......................................................................5

   Summary of Argument .....................................................................14

   Argument ..........................................................................................21

Point I   The District Court's Judgment should be vacated because
the District Court considered material extraneous to the AC that was
inadmissible and inconclusive and it did not resolve all inferences and
legal conclusions in The Providers' favor when resolvingAetna's Motion
to Dismiss  ........................................................................................21

   A.  Legal Standard when deciding a motion to dismiss and
   considering material extraneous to the AC ........................................22

     1.  *The District Court erroneously determined the Oct 4 Partial
     Transcript was integral to the AC*...................................................24

i

2. *The Oct 4 Partial Transcript should not have been considered because it was not in admissible form, was not attached to or incorporated by reference in the AC, was not integral to the AC, and is not subject to any other rule that permits its consideration* .......... 25

3. *The Pre-authorization letter should not have been excluded if the Oct 4 Partial Transcript was included because the effect of the letter was to inform The Providers the specified surgery was approved and the terms and conditions for Aetna's payment* ........... 29

B. The District Court erred as a matter of law by not resolving all inferences in favor of The Providers and by failing to recongnizethe customs, practices, usages, and terminology of the healthcare industry ............................................................................ 31

Point II  The District Court erred as a matter of law because it failed to consider facts alleged in the AC and did not give The Providers the benefit of every reasonable inference ............................................... 39-40

C. New York Law regarding partial performance and intention to be bound ............................................................................ 44

D. Aetna's conduct was such that a reasonable person would think Aetna and The Providers had reached an agreement and that Aetna

made a clear and unambiguous promise ............................................ 47

    E.   The District Court erred as a matter of law when found no difference between the legal requirements for *quantum meruit* and unjust enrichment, and therefore concluded that the surgery the providers rendered had to be at Aetna's request and that the unpaidmoney Aetna kept in its pockets as profits was not a benefit. ............................................................................................ 52

    F.   The District Court erred as a matter of law when it dismissed The Providers Fraudulent Inducement claim because The AC alleges facts demonstrating a fraudulent intent at the time of the representation of reimbursement at 80 percent Reasonable and Customary ............................................................................................ 56

  Point III .The Implications of the District Court's Order ................. 59

  Conclusion ....................................................................................... 62

## T<small>ABLE OF</small> A<small>UTHORITIES</small>

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................... 23

*Aton Center, Inc. v. Blue Cross and Blue Shield of Ill.*, No. 20-cv-0500-

    WQH, 2021 WL 615051, (S.D.Cal. Feb. 16, 2021)(.............................. 37

*Aton Ctr., Inc. v Blue Cross & Blue Shield*, 2021 US Dist LEXIS 18881

    (SD Cal Feb. 1, 2021, No. 3:20-cv-00492-WQH-BGS)) ........................ 62

*Barnes v. Perine*, 12 N.Y. 18 (1854) ........................................................ 50

*Beth Isr. Med. Ctr. v Horizon Blue Cross & Blue Shield of New Jersey,*

    *Inc.*, 448 F3d 573 (2d Cir 2006)............................................................ 46

*Bristol SL Holdings, Inc. v. Cigna Health Life Ins. Co.*, No. SACV 19-

    00709 AG (ADSx), 2020 WL 2027955,

    (C.D. Cal. Jan. 6, 2020) ........................................................... 38, 41, 43

*California Spine & Neurosurgery Inst. v. United Healthcare Servs., Inc.*,

    No. 18-CV-2867 PSG (AFM), 2018 U.S. Dist. LEXIS 225961, 2018 WL

    6074567 (C.D. Cal. June 28, 2018)....................................................... 42

iv

*California Spine & Neurosurgery Inst. v. United Healthcare Servs., Inc.*,
No. 18-CV-2867 PSG (AFM), 2018 WL 6074567 (C.D. Cal. June 28,
2018) ...................................................................................... 39

*Chambers v Time Warner, Inc.*, 282 F3d 147
(2d Cir 2002)) ..................................................... 23, 24, 26, 28

*Charles Deng Acupuncture, P.C. v Titan Ins. Co.*, 74 Misc 3d 137[A],
2022 NY Slip Op 50300[U] (App Term, 2d Dept, 2d, 11th & 13th Jud
Dists, 2022) ........................................................................... 27

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*, 773 F.3d
110 (2d Cir. 2014) ................................................................. 36

*Chiron Recovery Ctr., LLC v. United Healthcare Servs., Inc.*, 2020 WL
3547047 (S.D. Fla. June 30, 2020) ................................... 40, 41

*Cooper v. Parsky*, 140 F.3d 433 (2d Cir. 1998) ...................................... 34

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) 22-23

*Ctr., Inc. v. Blue Cross & Blue Shield*, Case No.: 3:20-cv-00492-WQH-
BGS, 2021 U.S. Dist. LEXIS 18881 (S.D. Cal. Feb. 1, 2021) ........ 43, 62

*DiFolco v MSNBC Cable L.L.C.*, 622 F3d 104 (2d Cir 2010) ................. 33

*Einhorn v. Mergatroyd Prods.*, 426 F. Supp. 2d 189
(S.D.N.Y. 2006) .............................................................. 45, 47

v

*Ellig v. Molina*, 996 F. Supp. 2d 236 (S.D.N.Y. 2014) ............................ 47

*Enzo Biochem v Johnson & Johnson*, 1992 US Dist LEXIS 15723

[SDNY Oct. 14, 1992, 87 Civ. 6125 (KMW)] ........................................ 57

*Faulkner v Beer*, 463 F3d 130 (2d Cir 2006) .................................... 24, 25

*Flores v Lower E. Side Serv. Ctr.*, 4 NY3d 363 (2005) ............................ 33

*Gen. Partner Glenn Tongue v Sanofi*, 816 F3d 199 (2d Cir 2016) .......... 37

*Keiler v Harlequin Enters.*, 751 F3d 64 (2d Cir 2014) ............................ 23

*Keuka College v. Ray*, 167 N.Y. 96 (1901) .............................................. 50

*Kiss Constr., Inc. v Edison Elec. Contrs., Corp.*, 152 AD3d 575

(2d Dept 2017) ........................................................................... 46

*Leonard v Pepsico, Inc.*, 88 F Supp 2d 116 (SDNY 1999) ...................... 49

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898 (2d Cir. 1997) ............ 37

*Lively v WAFRA Inv. Advisory Group, Inc.*, 6 F.4th 293

(2d Cir 2021) .......................................................................... 33-34

*Mulitex USA, Inc. v Marvin Knitting Mills, Inc.*, 12 AD3d 169 (1st Dept

2004); ........................................................................................ 46

*Natl. Mkt. Share, Inc. v Sterling Natl. Bank*, 392 F3d 520

(2d Cir 2004) ............................................................................. 44

*Newman & Schwartz v Asplundh Tree Expert Co.*, 102 F3d 660 (2d Cir 1996) ....................................................... 34

*Out of Network Substance Use Disorder Claims,* No. SACV 19-2075 JVS (DFMx), 2020 U.S. Dist. LEXIS 81195, 2020 WL 2114934 (C.D. Cal. Feb. 21, 2020) ...................................................... 42

*Out of Network Substance Use Disorder Claims*, No. SACV 19-2075 JVS (DFMx), 2020 WL 2114934 (C.D. Cal. Feb. 21, 2020) ......................... 38

*Pac. Bay Recovery, Inc. v. Cal. Physicians' Servs., Inc.,* 12 Cal.App.5th 200 (Cal. Ct. App. 2017) .......................................... 34-35, 41

*Pac. Bay Recovery, Inc. v. Cal. Physicians' Servs., Inc.,* 218 Cal. Rptr. 3d 562 (Cal. App. 2017) ................................. 40

*Parker, Chapin, Flattau & Klimpl v Daelen Corp.,* 59 AD2d 375 (1st Dept 1977) ............................................. 46

*Petterson v Pattberg*, 248 NY 86 (1928) .................................. 47

*Regents of University of California v. Principal Financial Group,* 412 F. Supp. 2d 1037 (N.D. Cal. 2006) ................................. 39

*Rightnour v. Tiffany & Co.*, 239 F. Supp. 3d 744 (SDNY 2017)....... 49, 50

*RLS Assoc., LLC v United Bank of Kuwait PLC*, 380 F3d 704 (2d Cir 2004)........................................................ 49

*RMP Enters., LLC v. Conn. Gen. Life Ins. Co.*, Case No. 9:18-CV-80171, 2018 WL 6110998 (S.D. Fla. Nov. 20, 2018) ..................... 40, 41

*Ryan v Kellogg Partners Inst. Servs.*, 19 NY3d 1 (2012) ................. 48, 50

*S.S.I. Invs., Ltd. v Korea Tungsten Min. Co.*, 80 AD2d 155 (1st Dept 1981) ..................................................................................... 45

*Seven Seas Trading Co. v. Nan Hong Farm, Inc.*, No. 96 Civ. 7249 (SS), 1997 U.S. Dist. LEXIS 9290, 1997 WL 370590 (S.D.N.Y. July 1, 1997) ........................................................................ 46

*Sharp Intl. Corp. v State St. Bank & Trust Co.* (*In re Sharp Intl. Corp.*), 403 F3d 43 (2d Cir 2005) ............................. 61

*Starr v. Freeport Dodge, Inc.*, 54 Misc. 2d 271, 282 N.Y.S.2d 58 (N.Y. Cnty. Dist. Ct. 1967) ................................................................. 46

*T.D. Bank, N.A. v JP Morgan Chase Bank, N.A.*, 2010 US Dist LEXIS 109471, at *19 [EDNY Oct. 14, 2010, No. 10-CV-2843 (JG) (ARL)] ... 55

*TML Recovery, LLC v. Humana Inc.*, 2019 U.S. Dist. LEXIS 128923 (C.D. Cal. Mar. 4, 2019) ..................................................................... 62

*TML Recovery, LLC v. Humana, Inc.*, (No. 18-cv-00462, 2019 WL 3208807)(C.D. Cal. Mar. 4, 2019 ............. 34

*Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*,

    150 F. Supp. 2d 556 (S.D.N.Y. 2001) ....................................................55

*United States v. Komasa*, 767 F.3d 151 (2d Cir. 2014).............................26

*Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260

    (2d Cir. 1987) ............................................................................................36

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012).......23-24

*Winston v. Mediafare Ent. Corp.*, 777 F.2d 78 (2d Cir.1985) .................44

## Statutes

28 U.S.C. § 1332 .........................................................................................1

Fed. R. Civ. P.  80 .....................................................................................27

Fed. R. Civ. P. 12(b)(6) ...............................................................2, 4. 21, 23

FRE 901(a)..................................................................................................28

## Treatises

*Restatement, Contracts §§ 52, 75* .............................................................50

## JURISDICTION

This run-of-the-mill collections action was commenced by Appellants
Rowe Plastic Surgery of New Jersey, L.L.C., (RPSNJ) and Norman
Maurice Rowe, M.D., M.H.A., L.L.C., ("Rowe LLC") (collectively
"Appellants" or "The Providers") against Aetna Insurance Company,
("Aetna") by way of Complaint ("Compl." ECF Doc. No. 1) asserting
purely state law claims to remedy Aetna's underpayment for a surgery
rendered to Aetna's insured, E.L.S. Appellants filed an Amended
Complaint ("AC" ECF Doc. No. 13) on August 24, 2023, in the Eastern
District of New York; the matter was subsequently transferred to the
Southern District of New York. Aetna never joined issue, i.e., Aetna
never formally denied the allegations of the Compl. or the AC.

Diversity Jurisdiction exists with the Southern District of New York
under 28 U.S.C. § 1332, because the parties in this matter are citizens
of different states and the amount in controversy exceeds $75,000.

Appellants filed their Notice of Appeal (ECF Doc. No. 30) on
December 21, 2023. The Notice of Appeal is timely because it was filed
10 days after the District Court granted Aetna's Motion to Dismiss the

1

Complaint (JA- 45-46, "MTD", ECF Doc. No. 20) pursuant to Fed. R. Civ. P. 12(b)(6) by an Opinion and Order, filed December 11, 2023, ("District Court Order," ECF Doc. No. 20) and the Final Judgment entered by the Clerk of the Court December 11, 2023 (JA-306 "Clerk's Judgment," ECF Doc. No. 21).

### ISSUES PRESENTED:

#### Consideration of the entirety of the AC

The AC alleges Aetna pre-approved a specific surgery to be rendered to E.L.S. and offered to pay a specific rate of payment.  The AC further alleges submission of billing for that pre-approved surgery and a partial payment by Aetna.

Was it error for the District Court to pay those allegations no mind, fail to draw all reasonable inferences in The Providers' favor,  and determine The Providers had no legal, equitable, or tortious remedy?

#### Consideration of Documents Extraneous to the Amended Complaint

The District Court considered a transcript of a telephone call created after the AC was drafted integral to the AC.

Was it error for the District Court to, at the same time, determine a letter from Defendant, dated prior to the relevant surgery and addressed to The Providers' surgeon, memorializing the alleged pre-approval for the specific surgery rendered and setting forth the terms and conditions for payment not integral?

3

**Industry Participants**

The District Court found Aetna merely recited E.L.S.'s plan benefits.

Did the District Court err as a matter of law when it did not have the benefit of knowing the plan's terms; the transcript relied upon for context by the Court made no reference to any plan; the speakers used obvious industry terms; the parties were participants in the healthcare industry; and there were allegations the parties had completed similar transactions for similar services under similar circumstances in the past?

**Underlying Errors**

When deciding a motion to dismiss a complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), all district courts must construe the complaint liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor.

Was the cumulative result of the District Court's errors the erroneous conclusion that The Providers had no claim under New York Law?

4

### STATEMENT OF THE CASE

This is an appeal from an order of Judge J. Rakoff, Southern District of New York that dismissed The Providers Amended Complaint ("AC") for failure to state a claim for breach of contract, unjust enrichment, promissory estoppel, and fraudulent inducement (JA-306[1])(SPA-21[2]).

The Providers are surgical practices located in New York and New Jersey (JA- 29). They provide surgical services using specialized techniques that are otherwise unavailable with Aetna's in-network providers. ((JA-30 at ¶12) Aetna, a Connecticut corporation, is authorized to sell and administer health insurance in New York State (JA-28). E.L.S. ("The Patient") was a consumer of Aetna's health insurance and E.L.S. had a medical necessity for breast reduction mammaplasty and desired that The Providers perform that surgery (JA-30 at ¶12).

The Providers allege they entered into an agreement with Aetna to perform the required surgery to benefit E.L.S. (JA-31 at ¶18). The

_____

[1] Reference to the Joint Appendix is in the Following Format: JA-##
[2] Reference to the Special Appendix is in the Following Format: SPA-##

5

Providers allege Aetna represented without ambiguity that the reimbursement for out-of-network services would be at the specific rate of 80 percent Reasonable and Customary --an industry standard rate determinable by reference to industry accepted sources (JA-31 at ¶20 and JA-32 at ¶21, 22, 24, 25, 26). Relying on the agreement with Aetna The Providers allege they forbore collecting payment in-full from E.L.S. and rendered the Aetna pre-approved breast reduction mammaplasty to her. (JA-32. at ¶36). The Providers allege that Aetna did not reject their performance, but instead determined that The Providers had a right to payment and subsequently issued a payment; albeit at an incorrect and unreasonable amount, directly to The Providers (JA-35. at ¶40, 41, 42, 43, 44, 45).

The Providers allege that Aetna made their offer during a phone call between their employee and an Aetna employee on October 4, 2020 ("The Oct. 4 Call"). Prior to rendering the surgery to E.L.S., The Providers called the phone number provided by Aetna for medical providers to obtain insurance coverage and payment information (JA-31. at ¶19, 20). During The Oct. 4 Call Aetna represented to The Providers , *inter alia*, that Aetna would make reimbursement at a rate

6

of 80 percent Reasonable and Customary, a rate recognized in the healthcare industry which can be determined by reference to sources recognized in the healthcare industry as a reliable source for medical service pricing (JA-31. at ¶20).

The Providers allege an objective manifestation that they and Aetna were of one mind regarding providing breast reduction mammaplasty to E.L.S. The Providers further allege that they submitted medical records to Aetna on October 28, 2020, for an out-of-network provider review and that Aetna determined the breast reduction mammaplasty was a medically necessary procedure on November 2, 2020, ("The Nov. 2 Pre-approval") (JA-31.32 At ¶¶ 20--27).

The Providers allege unequivocal compliance with and acceptance of Aetna's offer. Because Aetna represented reimbursement at 80 percent Reasonable and Customary The Providers performed the Aetna pre-approved surgery (JA-32. 33 At ¶¶ 24 and 36). Because Aetna represented to them that reimbursement would be at 80 percent Reasonable and Customary The Providers also forbore collecting payment in-full from E.L.S. (JA-40. at ¶78).

The Providers allege Aetna ratified and then breached the agreement

7

between them. After its receipt of The Providers' bill Aetna issued reimbursement directly to The Providers though not at the agreed upon rate (hereinafter referred to as "The Underpayment") (JA-34-35. at ¶¶37-43). Aetna intentionally failed to use the agreed upon rate of 80 percent Reasonable and Customary to calculate The Underpayment or Aetna incorrectly calculated 80 percent Reasonable and Customary or Aetna intentionally tuned its claims processing system to never pay 80 percent Reasonable and Customary (JA-35-36 at ¶¶47,48; JA-36-37 at ¶¶54, 59-60; and JA-41 at ¶83 ). Either way the result was that Aetna was able to keep money in its pockets that it was obligated to pay to The Providers and The Providers suffered damages as a direct result of The Underpayment (JA-36 at ¶48-50).

The Providers allege a course of prior dealing with Aetna wherein one-time transactions like this one were entered into on numerous occasions between The Providers and Aetna, and that surgical services were provided to various patients and reimbursed under the same or similar circumstances (JA-32, 39, 40 at ¶¶ 21, 71, 76). The Providers had no reason to expect this transaction would be any different.

Aetna has failed to present any witness(es) to dispute the veracity or

8

factual accuracy of The Provider's allegations. (JA-85-86 Petrozelli Decl., Ex. A, ECF No. 22). Aetna has failed to present any witness(es) that claim its payment was a mistake or was gratuitous (id.). Indeed, Aetna has failed to present any witness(es) to say it never entered into an agreement with The Providers (id.). As the Amended Complaint alleges, a unilateral contract was formed between the parties and then breached by Aetna after The Providers had already performed (JA-37 at ¶57-60).

The Providers allege Aetna should be estopped from denying it represented reimbursement for out of network services at the 80 percent Reasonable and Customary rate because they detrimentally relied on that representation. But for Aetna's representation of reimbursement at 80 percent Reasonable and Customary The Providers would not have performed the surgery on E.L.S.(JA-40 at ¶77). But for Aetna's representation of reimbursement at 80 percent Reasonable and Customary The Providers would have collected payment from E.L.S. in full prior to performing the surgery (id. at ¶78). Aetna fails to establish any of those allegations are not facts and Aetna has not filed an answer disputing The Provider's allegations.

The Providers allege their reliance was reasonable. Aetna determined the reduction mammaplasty was necessary and covered so they should have expected it to be performed (JA-32 at 24-25). Additionally, Aetna had made reimbursement to The Providers under similar circumstances in the past (JA 39-40 at ¶¶71-76) and there was no reason to suspect that this time would be different (JA-32, 39, 40 at ¶¶ 21, 71, 76).

The AC alleges that Aetna was unjustly enriched (JA-38 at ¶67). Allowing Aetna to keep the monies it was otherwise obligated to pay to The Providers is unjust (JA-39 at ¶68). The Providers allege that every dollar Aetna was obligated to pay but didn't, is another dollar of profit in Aetna's pocket (JA-36 at ¶48-50).

The Providers allege Aetna lied about the reimbursement being at 80 percent Reasonable and Customary solely to induce The Providers into accepting Aetna's offer of reimbursement and perform the necessary breast reduction mammaplasty to E.L.S. (JA-41 at ¶82). The Providers further allege that but for the representation of reimbursement at the rate of 80 percent Reasonable and Customary they would have never rendered the surgery (JA-40 at ¶77). The Providers further allege had

10

they known Aetna was not going to issue reimbursement at 80 percent of Reasonable and Customary they would have collected more money from E.L.S. prior to rendering the breast reduction mammaplasty (JA-40. at ¶78). Under no circumstances would The Providers have agreed to perform the necessary breast reduction mammaplasty at The Underpayment rate provided by Aetna (JA-40 at ¶77.

Rather than join issue Aetna moved to dismiss the AC claiming The Providers ' claims were expressly preempted by Employee Retirement Income Security Act (ERISA) §514. In the alternative, Aetna argued The Providers failed to state a claim because there was no agreement formed between the parties(JA-45). Aetna attached documents to its motion including a purported summary description of E.L.S.'s insurance plan ("Plan Document") (Petrozelli Decl., Ex. A, ECF No. 22-1)(JA-87-239); A purported transcript of the October 4 Call ("Oct 4 Partial Transcript") (Petrozelli Decl., Ex. B, ECF No. 22-2)(JA-50-61); and the November 2 Authorization Letter addressed to Norman Rowe one of the surgeons for E.L.S. ("Authorization Letter") (Petitt Decl., Ex. A, ECF No. 21-1)(JA-240-258).

Aetna allegedly found a recording of Oct. 4 Call (JA-86 at ¶3) and

11

provided a copy of that recording to its lawyers who arranged for a transcription, which turns out to be incomplete (JA-48 at ¶8). Aetna then moved to dismiss the Amended Complaint claiming that the incomplete transcript demonstrated Aetna never made an offer. Aetna made this argument despite ever establishing any allegation was no fact (JA-47 at ¶3).

The District Court agreed and disagreed with Aetna's position (JA-294 at ¶b, Rakoff Order, dated December 11, 2023, at p. 10)(SPA-10 at ¶b). The District Court denied Aetna's Motion to Dismiss based on express preemption but granted the Motion based on failure to state a claim (id.). The District Court considered the Oct. 4 Partial Transcript but not the Plan Document or the Authorization Letter (JA-291-292 at pp.7-8)(SPA-7,8). The District Court, nevertheless, determined the Plan document was not subject to judicial notice and neither incorporated by reference nor integral to the AC(id. at p. 8). The District Court determined that the Oct. 4 Partial Transcript was integral to the AC but not the Authorization Letter, which the District Court also found was neither subject to judicial notice nor incorporated by reference (id. at p.7).

12

Relying solely on the contents of the Oct 4 Partial Transcript, and paying no mind to the allegations of Aetna's agreement on the need for the surgery and Aetna's representation of reimbursement, a promise of future payment[3], The District Court dismissed The Providers' contractual claims as well as their claims for unjust enrichment, promissory estoppel claims, and fraudulent inducement (JA-298-304. at pp 14, 16, 19, and 20)(SPA 14, 16, 19, and 20). The District Court also made the ultimate conclusion that The Providers had no legal, equitable, or tortious remedy (JA-304 at p 20 )(SPA-20). The District Court then dismissed the AC with prejudice stating the legal deficiencies were such that no conceivable amendment could fix the AC(id. at p. 20).

_____

[3] Reimbursement is the noun of the transitive verb reimburse which means 1. to pay back to someone; 2. to make restoration or payment of an equivalent to; , "Reimburse." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/reimburse. Accessed 14 Feb. 2024.

### SUMMARY OF ARGUMENT

The District Court determined that medical providers failed to state a claim for relief in an action where the allegations are: a representation by the insurer to the medical providers of reimbursement at a specific rate, pre-authorization by the insurer for those same medical providers to render a specific surgery, and a partial payment from the insurer after receipt of the providers' billing for the specified surgery. Absent proof the payment was mistake or gratuitous, no reasonable person would think insurers issue payment to someone they had no legal obligation to pay; especially health insurers in the USA[4][5].

The AC alleges facts setting forth *prima facie* causes of action for breach of contract, unjust enrichment, promissory estoppel, and fraudulent inducement. However, when deciding Aetna's Rule 12(b)(6) motion, the District Court ignored certain factual allegations of

_____

https://www.propublica.org/article/health-insurance-denials-breaking-state-laws accessed Febaruary 13, 2024[4]

[5] https://kffhealthnews.org/news/prior-authorization-revoked-patients-stuck-with-bills-after-insurers-dont-pay-as-promised/ accessed February 13, 2024

14

the AC and did not give The Providers the benefit of every reasonable inference arising therefrom.

The District Court also considered material extraneous to the AC, offered by Aetna, which was not subject to judicial notice and was neither attached to nor incorporated by reference in the AC. Additionally, there was no evidentiary foundation laid for the District Court to determine the admissibility of Aetna's submission. Aetna submitted three items in support of their motion: 1) The summary description for E.L.S.'s insurance plan; 2) A transcript of the October 4, 2020, call between The Providers' employee and Aetna's employee; and 3) The November 2, 2020, pre-authorization letter approving E.L.S.'s surgery. None of those documents are admissible as business records of Aetna. Those items are not <u>records of an activity</u>, they *were* the activity itself.

The Oct 4 Partial Transcript was not—and could not be—integral to drafting the AC because it was created after the AC was filed. Further, if the Oct 4 Partial Transcript is integral to the AC, then the Pre-Authorization letter must be integral because its terms and effect were specifically identified in the AC, and it was addressed to Norman Rowe.

15

The Pre-Authorization letter is an objective manifestation of a meeting of the minds regarding the parties' agreement for the need to render reduction mammaplasty to E.L.S. Lastly, the Pre-Authorization letter set forth the conditions for Aetna's payment, which The Providers clearly satisfied.

Moreover, the Oct 4 Partial Transcript contains internal ambiguities which were not resolved in The Providers' favor and from which the Court made inferences that did not benefit The Providers. The transcript shows the speakers using industry terms that no reasonable person would understand without a working knowledge of health insurance terminology. Additionally, the Aetna employee obviously knows who is calling without being told ("Oh, and by the way, ma'am, you're calling for Dr. Rowe, Norman) and the patient's name without being told ("And this is for E S or E S?"). The Oct 4 Partial Transcript, therefore, gives rise to a permissible inference that there is a course of dealing between the parties establishing a common basis of understanding for interpreting their expressions and conduct.

Faced with those ambiguities and the remaining allegations, it is apparent the District Court erred by resolving inferences in favor of the

moving party. The District Court did not apply the correct standard when it reviewed the AC because it erroneously failed to credit the AC's allegations and give The Providers the benefit of every inference.

The District Court's Opinion and Order ignores the inference of ratification raised by the allegation of Aetna's payment and the inference of the unjust nature of the profit earned by Aetna when it kept, in its pocket, the difference between what it represented it would pay and what it actually paid. The District Court also ignored the significance of The Providers' allegation of forbearance based on their prior course of dealing with Aetna, Aetna's pre-approval of the surgery, and its representation of reimbursement for the specific surgery at a specific rate. The Court also failed to credit the allegation that Aetna knew its claims processing system did not allow for payment using 80% Reasonable and Customary, and the inference of scienter that arises therefrom.

In other words, between two conclusions the District Court consistently chose the one that did not benefit The Providers.

No witness from Aetna ever denies any allegation of the AC. No witness from Aetna states its payment to The Providers was not a

ratification of its agreement with The Providers. No witness from Aetna says its payment to The Providers was a mistake, gratuitous, or the result of some other legal obligation. Aetna's failure to address its payment should have given the District Court pause, instead the District Court erroneously ignored the allegation of payment together with the inferences and legal implications arising from the fact of Aetna's payment.

Lastly, the implications of the District Court's order are significant. With no appellate guidance, the District Court's order means insurers don't have to be honest with the individuals they routinely transact business with. Medical providers would not be able to rely upon the representation of a specific rate of reimbursement made by a health insurer because they will have no remedy; especially when that health insurer also pre-authorizes the specific service the medical provider renders. The Record before the Court makes obvious this is the reality of business in the healthcare industry. In the absence of appellate authority from New York, the District Court relied upon a California District Court case applying California law to find Aetna was merely reciting the patient's plan benefits and that, in the health care industry,

18

an insurer's verification is not a promise to pay. This despite no mention or reference to any plan in the Oct 4 Partial Transcript.

Regardless, the California District Court opinion stated that a health care provider isn't entitled to recover beyond what a health plan mandates; but went on to say the provider may be entitled to more payment if the insurer specifically agreed to pay the provider more. Here, unlike the California case relied upon by the District Court, the AC offers detailed allegations that the insurer authorized a specific service, represented reimbursement at a specific rate, and then made a payment that was not at the represented rate.

We submit this Court should adopt as a rule the dicta stated in the California District Court Opinion: an out-of-network health care provider that renders a pre-approved surgery has a remedy to recover the amounts called for in the patient's health plan and if an insurer represents payment at an amount greater than the plan dictates, then the provider is entitled to payment beyond the health plan's terms (i.e., the amount the insurer represented). The Providers seek merely what Aetna represented it would pay. There is a factual issue as to whether 80 percent Reasonable and Customary is the reimbursement rate

19

mandated by E.L.S.'s plan, but there is no factual issue that's the rate

Aetna represented.

<u>ARGUMENT</u>

The District Court misapplied the law under Fed. R. Civ. P. 12(b)(6) when it improperly considered material extraneous to the Complaint, resolved factual issues and ambiguities in favor of the moving party, and made inferences that did not benefit The Providers (JA 289-291 and 295-300). The District Court's Order ignores material allegations of the AC and makes clearly erroneous findings which were not supported by evidence in the Record (JA 289-305. Accordingly, this Court should vacate the Judgment of Dismissal, reinstate the AC, and remand this matter to the District Court for further proceedings.

**Point I     The District Court's Judgment should be vacated because the District Court considered material extraneous to the AC that was  inadmissible and inconclusive and it did not resolve all inferences and legal conclusions in The Providers' favor when resolving Aetna's Motion to Dismiss**

Aetna submitted three items with their motion to dismiss for the District Court to consider ("Aetna's Evidence"): 1) The summary description for E.L.S.'s insurance plan ("E.L.S.'s Plan Document")(JA 87-239); 2) A transcript of the October 4, 2020, call between The Providers' employee and Aetna's employee (The Oct 4 Partial

21

Transcript)(JA 50-61); and 3) The November 2, 2020, pre-authorization letter approving E.L.S.'s surgery ("The Pre-authorization Letter")(JA 240-258). None of those items are admissible as Aetna's business records. Those items are not records <u>of an activity</u>, they *were* the activity itself.

The District Court considered the Oct 4 Partial Transcript, but not E.L.S.'s Plan Document or the Pre-authorization Letter (JA 289-293). The District Court properly excluded E.L.S.'s Plan Document from its consideration because it was neither probative nor integral to the AC (JA 292-293). The District Court improperly considered the Oct 4 Partial Transcript as integral to the Complaint (JA 290). Because the District Court considered the Oct 4 Partial Transcript, it was improper for the Court to exclude the Pre-Approval letter.

## A. Legal Standard when deciding a motion to dismiss and considering material extraneous to the AC

Generally, Aetna would have to pose a defense in its answer. However, there are seven exceptions where a pleading "may be challenged by motion, of which the 'failure to state a claim upon which relief can be granted' is the sixth." (*Cortec Indus., Inc. v. Sum Holding*

*L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), quoting Fed. R. Civ. P. 12(b)(6)).

This Court reviews *de novo* the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. When reviewing the District Court's Order, this Court accepts all factual allegations as true and draws all reasonable inferences in favor of The Providers (*Chambers v Time Warner, Inc.*, 282 F3d 147, 152 (2d Cir 2002)).

The AC "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,' " (*Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Id*.). The Providers' AC "does not need to contain detailed elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." (*Keiler v Harlequin Enters.*, 751 F3d 64, 70 (2d Cir 2014), citing *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, at 323-24 (2d Cir. 2011)). Because The Providers appeal "from a Rule 12(b)(6) dismissal [they] may elaborate on [their] allegations so long as the elaborations are consistent with the pleading" (*Wigod v.*

23

*Wells Fargo Bank, N.A.*, 673 F.3d 547, 555-56 (7th Cir. 2012) [collecting cases]).

### 1. *The District Court erroneously determined the Oct 4 Partial Transcript was integral to the AC*

The District Court erred as a matter of law when it determined the Oct 4 Partial Transcript was integral to the AC (JA 290). The District Court compounded that error by then finding the Pre-authorization Letter not integral to the AC (JA 291).

"Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." (*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) [emphasis added], citing *Audiotext Network, Inc. v. Am. Tel. Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) [*per curiam*]). But material outside of the record cannot serve as the basis for dismissal unless there is no dispute regarding its authenticity or accuracy and it must be clear that there are no material disputed issues of fact regarding the relevance of the document (*See*, *Faulkner v Beer*, 463 F3d 130, 134 (2d Cir 2006)).

**2.** ***The Oct 4 Partial Transcript should not have been considered because it was not in admissible form, was not attached to or incorporated by reference in the AC, was not integral to the AC, and is not subject to any other rule that permits its consideration***

The AC was filed August 24, 2023 (JA 28). The Oct 4 Partial Transcript was prepared by a court reporting agency on September 26, 2023 (JA- ECF 21-1 "Xcript." p. 8)(JA 48 at ¶8). It is a factual impossibility for The Providers to have relied upon the Oct 4 Partial Transcript when drafting the AC. In determining whether material outside of the record is integral to the AC, the District Court must determine whether the plaintiff possessed the material, and relied upon that material, *prior to* drafting its complaint. (*See, Faulkner* 463 F3d 130, 134-135 (2d Cir 2006) (district court's dismissal of the complaint based on warning language in an offering plan was improper where the complaint was unclear as to whether all plaintiffs received the offering plan prior to investing and therefore plaintiff's claims could not be dismissed based on the warning of risk in that document)). *Indeed*, the Declaration of Michael Manzo filed in opposition to Aetna's Motion, which the District Court erroneously failed to consider, makes obvious that The Providers relied upon their own records as their factual basis

25

for the AC (ECF No 25, Declaration of Michael Manzo filed in in opposition (Manzo Decl.) (JA 262 at ¶¶15-20). The record before the District Court establishes The Providers did not rely on the transcript in pleading their case (cf. *Chambers,* supra); *Audiotext,* supra.)(JA 48 at ¶¶5-9). Furthermore, the Oct 4 Partial Transcript is not admissible because it is incomplete on its face as evident at page 3 of the transcript. (JA 52). The transcript identifies two speakers: Elly and the Aetna Customer Service Representative (hereafter "Aetna CSR") (Xcript. 2:1,7). The Aetna CSR knows Elly is calling about Dr. Norman Rowe regarding E.L.S. without Elly ever saying so (JA 52 at lines 22-25). Thus, the Oct 4 Partial Transcript makes obvious there is more to the parties' conversation than the transcript reveals.

The Oct 4 Partial Transcript is also not admissible as Aetna's business record. "To lay a proper foundation for a business record, a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the record" (*United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014)). The Oct 4 Partial Transcript, which was prepared solely for the purpose of

26

litigation, is not a business record of Aetna because it is not a record of a regularly conducted activity and the transcript was not made by Aetna. (JA- Xcript)(JA 48 at ¶8). The Oct 4 Partial Transcript is not a record of actions taken by Aetna, it's "a record of words that were uttered". (*Charles Deng Acupuncture, P.C. v Titan Ins. Co.*, 74 Misc 3d 137[A], 2022 NY Slip Op 50300[U] (App Term, 2d Dept, 2d, 11th & 13th Jud Dists, 2022)). The transcript is not a record of an activity, it is a recording of the act itself. Additionally, there is nothing in the record that establishes the Oct 4 Partial Transcript Aetna offers was "kept in the course of a regularly conducted business activity" (JA 48 at ¶8).

There is no Federal Rule of Evidence or Civil Procedure that permits entry into evidence a transcript of a phone call prepared by a court reporting agency. FRCP Rule 80 permits stenographic transcription of trials and hearings into evidence (see, Fed. R. Civ. P. 80). " If stenographically reported testimony at a hearing or trial is admissible in evidence at a later trial, the testimony may be proved by a transcript certified by the person who reported it." (*id.*).

There is nothing in the record from which this Court can determine whether the transcript is reliable. There is no evidence of any of the

27

following facts, which would establish the transcript was reliable: the capacity of the recording device, whether the transcript is authentic and correct; whether any changes, additions or deletions had been made, and the manner in which the recording was preserved (see FRE 901(a)).

Lastly, the Oct 4 Partial Transcript was not integral to the AC. The AC does not "rel[y] heavily upon [The Oct 4 Partial Transcript's] terms and effect"(*Chambers v Time Warner, Inc.*, 282 F3d 147, 153 (2d Cir 2002)). Additionally, the phone call was one small part of the entire transaction, and it is clear from the transcript that the *entire* phone call was not even transcribed. Aetna issued an authorization pre-approving the surgery (JA 32 at ¶24, JA 86 at ¶ 4 and JA 240-258) . The Providers submitted their billing to Aetna who did not reject that billing (JA 34 at ¶¶37-40 and JA 264 at ¶¶31, 34). Aetna makes many arguments why it purportedly has no obligation to pay anything to The Providers, but given the chance Aetna chose not to address the allegations that Aetna accepted The Providers billing. Aetna doesn't address the allegations that Aetna issued payment to The Providers in this case and others for the same or similar services (JA 35 at ¶ 42, 57, 71, and 76).

Accordingly, the District Court erred as a matter of law by

determining the Oct 4 Partial Transcript was integral to the AC.

**3.** ***The Pre-authorization letter should not have been excluded if the Oct 4 Partial Transcript was included because the effect of the letter was to inform The Providers the specified surgery was approved and the terms and conditions for Aetna's payment***

Assuming *arguendo* the Oct 4 Partial Transcript was integral to the AC, then the Authorization letter was just as integral. The AC alleges on October 28, 2020, The Providers initiated and submitted medical records for an out of network review and that on November 2, 2020, Aetna approved a breast reduction surgery, providing reference number 8457015110000 (JA 32 at ¶¶23-24). Aetna's witness confirms the substantive truth of this allegation (ECF No. 22, Petrozelli Decl. in support of motion at ¶4)(" Based on a review of Aetna's business records, on November 2, 2020, Aetna issued a pre-authorization letter regarding certain services to be performed by Dr. Rowe, with case number 8457015110000000")(JA 86 at ¶4). Aetna submitted a copy of that letter (ECF No. 22-2 "Pre-authorization letter). Aetna admits the allegations of the AC are true (JA 240-258).

The AC's allegation makes obvious that The Providers sought that Pre-authorization letter, had knowledge of the letter, and relied upon

the terms and effect of the letter as the basis for their claims (JA 32 at

¶¶24, 25).  Moreover, the Pre-Authorization letter's is addressed to

Norman Rowe and its salutation is "Dear Member and Healthcare

Provider(s) of Record" (JA 242- Pre-Authorization letter p.2). The

District Court failed to give the providers the benefit of the inference

that Aetna transmitted the Pre-Authorization letter to The Providers.

   The District Court erred as a matter of law when it found "Nor can it

be said that the [Pre-authorization] letter is integral to the AC, as the

AC does not "rel[y] upon its terms and effect" for any of the causes of

action that are asserted against defendant"(JA 291 District Court Order

at p. 7). The letter sets forth Aetna's pre-approval of the reduction

mammaplasty ("This service is approved at an out-of-network benefit

level.") (JA- 242 Pre-authorization letter at p.2). The letter also sets

forth Aetna's condition for payment (id.)("Coverage for this service has

been approved, subject to the requirements in this letter")(JA 242-244).

Taken together with The Providers performance of the specified surgery

and Aetna's ratification by payment, the letter is certainly integral to

the claims asserted in the AC. If the District Court found the Oct 4

Partial Transcript, a document that was not in existence when the AC

was drafted, integral to the AC then the Pre-Authorization letter should be considered integral as well.

The Providers, however, maintain that no document should have been considered by the District Court in resolving Aetna's Motion.

## B. The District Court erred as a matter of law by not resolving all inferences in favor of The Providers and by failing to recognize the customs, practices, usages, and terminology of the healthcare industry

The AC alleges "[b]y representing that it would reimburse medical services using 80% of Reasonable and Customary, Aetna made a unilateral offer to reimburse services rendered by non-party Dr. Norman Rowe, M.D. and non-party Dr. Lisa Schneider, M.D. using 80% UCR to determine the amount of reimbursement." (JA 33, AC at ¶27).

The Oct 4 Partial Transcript Aetna had prepared after the AC was filed says, *inter alia*, the following:

> ELLY: Okay. And what is the reimbursement rate? Reasonable on customary or Medicare?
>
> AETNA CUSTOMER REPRESENTATIVE: Let me just check this one for you. Can you bear with me? Okay. So for the reimbursement rate, it's going to be 80 percent reasonable and customary.

31

ELLY: 80 percent?

AETNA CUSTOMER REPRESENTATIVE: Yeah.(JA 55, Xcript
6:1-9).

The District Court found "No reasonable person would understand
that representation to be an offer or promise to pay a particular amount
to plaintiffs" and then dismissed The Providers Breach of Contract
claims (JA 297 - Opinion and Order p.13) The District Court found
"[C]ontext makes plain that defendant's employee was merely reciting
the benefits available if plaintiffs performed the breast reduction
surgery on E.L.S., not promising to pay plaintiffs a particular amount if
the surgery was in fact performed" and dismissed The Providers
Promissory Estoppel claim (JA 299- Opinion and Order at p. 15).

It was error for the District Court to infer the context of the
conversation was E.L.S.'s plan benefits. The AC allegations make
obvious The Providers are seeking to learn what **Aetna** will reimburse
because **Aetna** determines the total amount of payment it will make to
The Providers, and then applies E.L.S.'s share of the costs to that
amount (JA 29-31 - AC at ¶15, 16, and fn1). The legislative materials
cited establish that is how reimbursements for non-participating,

otherwise known as out-of-network providers, are determined (JA 30-AC at fn2). Therefore, there was a dual purpose in The Providers call: first, learn how E.L.S.'s cost share is determined and second, learn what **Aetna** is willing to pay.

The District Court inferred the speakers in the Oct 4 Partial Transcript were referring to E.L.S.' plan benefits. No speaker in the transcript mentions any plan, E.L.S' or anyone else's (JA 52-57 - Xcript 2-5). Indeed, the word plan doesn't appear in the transcript (id). Moreover, there is nothing in the record before the District Court establishing E.L.S' plan benefits. The District Court, therefore, had no basis to infer the speakers on the Oct 4 Partial Transcript were discussing E.L.S.'s plan benefits as a matter of law because where differing inferences may be drawn, a question of fact arises (see, *Flores v Lower E. Side Serv. Ctr.*, 4 NY3d 363, 368-369 (2005)).

Additionally, the District Court "assay[ed] the weight of the evidence" and improperly chose between reasonably competing interpretations by weighing the plausibility of an allegation with material extrinsic to the AC (see, *DiFolco v MSNBC Cable L.L.C.*, 622 F3d 104, 113 (2d Cir 2010)); (See also, *Lively v WAFRA Inv. Advisory*

33

*Group, Inc.*, 6 F.4th 293, 306 (2d Cir 2021)(improper for court to resolve facts at motion to dismiss without converting to Summary Judgment motion);(*Newman & Schwartz v Asplundh Tree Expert Co.*, 102 F3d 660, 662-663 (2d Cir 1996)(reversible error for district court to not construe the facts and the law in favor of the non-moving party for purposes of the motion to dismiss).

The duty of the District Court "[was] merely to assess the legal feasibility of the [AC] not to assay the weight of the evidence which might be offered in support thereof" (*Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)).

The District Court cited a California case, *TML Recovery, LLC v. Humana, Inc.*, (No. 18-cv-00462, 2019 WL 3208807, at *4)( C.D. Cal. Mar. 4, 2019) to support its rationale by relying on a quote that "in the healthcare industry a verification of benefits is not a promise to pay". No one from Aetna makes that assertion and in addressing the TML's implied contract cause of action the *TML* Decision stated "it is possible that a provider may be entitled to more payment if the insurer specifically agreed to pay the provider more [than the plan document provides]."(id)(citing *Pac. Bay Recovery, Inc. v. Cal. Physicians' Servs.,*

34

*Inc.,* 12 Cal.App.5th 200, 215 (Cal. Ct. App. 2017) ("Pacific Bay does not offer more detailed allegations that Blue Shield authorized a certain amount of treatment or agreed to pay a specific rate"). It is quite apparent that the TML provider alleged they verified the patients benefits but did not allege the insurer offered to pay a specific price or authorized a specific service.

The facts of this case are not the same as *TML* or any other decision where the provider merely obtained a verification of benefits without a representation of reimbursement at a specific price. In this case, both the AC and the extraneous material submitted by Aetna establish Aetna authorized a certain amount of treatment and agreed to pay a specific rate (*Pac. Bay Recovery*, *supra.*).

It was also error for the District Court to view the language used by the speakers in the transcript through the lens of a reasonable person (JA 297 - opinion and Order at p.13). As a matter of law, agreements and facts giving rise to their formation are "viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the

35

particular trade or business." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*, 773 F.3d 110, 114 (2d Cir. 2014);(*Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987)). A reasonable person is not the same as one who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

The transcript of the call makes obvious that the speakers were aware of the customs, practices, usages and terminology in the healthcare industry. The speakers used industry customs and terms (JA 52 .at 2:15-18) "I have a <u>CPT code</u> …<u>billing as professional</u>.)(JA 53 at 3:5-6) "servicing address")(JA 53 at 3:14-15) "covered at 100 percent. No deductible. No copay for physician")(JA 54 at4:2-13) "out-of-network coinsurance…it's going to be 70/30, ma'am…for the out-of-pocket …it's going to be 6000…The coverage is 70 percent after deductible… deductible of this patient for out-of-network is 3000 and based on their accumulation, nothing has been accumulated yet for the deductible. But for the out-of- pocket for out-of-network, patient also accumulate 178.69 cents")(JA 54 at 4:18-19) "what was the out-of-pocket for out-of-network?")(JA 55 at 5:2-3) "what is the reimbursement rate?

Reasonable on customary or Medicare?")(JA 55 at 5:7) "80 percent

reasonable and customary"). Not once during the exchange did any

speaker need any of those terms explained, each speaker knew to what

the other referred. This Court has already recognized that "a layperson,

unaccustomed to the subtleties and  intricacies" of a specific industry

may misinterpret a participant's statements (see, *Gen. Partner Glenn*

*Tongue v Sanofi*, 816 F3d 199, 211-212 (2d Cir 2016)(pharmaceutical

industry); (*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.

1997)(insurance industry).  This Court should rule the same reasoning

applies to the health insurance industry.

There is no appellate case law from New York that addresses

whether an insurer's representation of reimbursement at a specific rate

and authorization of a specific service gives rise to an action in contract.

The District Court looked to California, which holds that calls like the

one in this case can create a contract where the parties specifically

identify the services authorized and the payment rate see, e.g., *Aton*

*Center, Inc. v. Blue Cross and Blue Shield of Ill.*, No. 20-cv-0500-WQH,

2021 WL 615051, at *4 (S.D.Cal. Feb. 16, 2021)(collecting cases and

stating courts have found that factual allegations of coverage beyond

37

VOB and authorization phone calls may be sufficient to allege the existence of an oral or implied contract). In each of the cases cited in *Aton* the provider identified a specific service and specific rate of reimbursement (see, e.g., *Bristol SL Holdings, Inc. v. Cigna Health Life Ins. Co.*, No. SACV 19-00709 AG (ADSx), 2020 WL 2027955, at *3 (C.D. Cal. Jan. 6, 2020) ("Bristol's allegations go beyond a simple pre-authorization or verification and the blanket guarantee that Cigna would cover the treatment. For each patient, Bristol alleges what type of treatment was being sought …Bristol further alleges a specific billing rate pegged to a percentage of the usual, customary and reasonable rate"); *Out of Network Substance Use Disorder Claims*, No. SACV 19-2075 JVS (DFMx), 2020 WL 2114934, at *8 (C.D. Cal. Feb. 21, 2020) ("Plaintiff alleges that `. . . payments to Plaintiff equal to approximately 70% of Plaintiff's fully-billed charges (based on 30% co-insurance payable by the patients).". . . And `[i]n communication with Plaintiff, including telephone calls requesting verification of benefits, Defendants . . . represented to Plaintiff that the services provided to Defendants' insureds would be reimbursed at the fully billed charges. . . . These allegations plausibly describe the services United promised to pay for.");

38

*California Spine & Neurosurgery Inst. v. United Healthcare Servs., Inc.*, No. 18-CV-2867 PSG (AFM), 2018 WL 6074567, at *4 (C.D. Cal. June 28, 2018) ("The facts alleged include specific names and dates of the calls between Plaintiff and Defendant regarding payment for Patient's services, what the services would be, what was said, and by whom— including that Defendant agreed to pay a specific price: 75% of the UCR rate ...Plaintiff has sufficiently alleged that an oral contract was formed between the parties."); *Regents of University of California v. Principal Financial Group*, 412 F. Supp. 2d 1037, 1042 (N.D. Cal. 2006) ("...it would be reasonable to conclude based on the written authorizations that defendants intended to be bound, subject to the provisions of the policy.").

   We submit this Court should adopt the rationale of the California courts, and rule that Aetna's representation of reimbursement at a specific rate and pre-authorization approving the specific surgery The Providers rendered gives rise to a breach of contract action, both express or implied.

**Point II   The District Court erred as a matter of law because it failed to consider facts alleged in the AC and did not give The**

39

**Providers the benefit of every reasonable inference**

Aetna represented reimbursement at '80 percent Reasonable and Customary' and pre-approved the breast reduction at issue (JA-67¶¶20,24, and 27). After the services were rendered, and upon receipt of The Providers' billing, Aetna issued a partial payment directly to The Providers (JA- 69 ¶41-45). Aetna and the District Court never addressed the factual or legal significance of Aetna's payment, and the District Court also failed to address the factual and legal significance of the Pre-authorization Letter.

We recognize "Courts across the country agree that an insurer's verification of coverage is not a promise to pay a certain amount" (*Chiron Recovery Ctr., LLC v. United Healthcare Servs., Inc.*, 2020 WL 3547047, at \*15 (S.D. Fla. June 30, 2020), citing, *RMP Enters., LLC v. Conn. Gen. Life Ins. Co.*, Case No. 9:18-CV-80171, 2018 WL 6110998, at \*16-17 (S.D. Fla. Nov. 20, 2018) (collecting cases); *Pac. Bay Recovery, Inc. v. Cal. Physicians' Servs., Inc.,* 218 Cal. Rptr. 3d 562, 575 (Cal. App. 2017) (holding that allegations that an insurer verified coverage and preauthorized treatment "lack the specific facts required ... to determine there was any meeting of the minds between the parties ... as

40

to the rate [the insurer] would pay [the healthcare provider]").  Those cases, however, recognize a different outcome would be probable had there been an allegation of a specific rate or price, or conduct establishing the insurer agreed to pay a particular rate or price (see e.g., *Chiron Recovery Ctr. v. United Healthcare Servs.*, CASE NO. 9:18-CV-81761-ROSENBERG/REINHART, at *15 (S.D. Fla. Jun. 30, 2020), citing *RMP Enters., LLC v. Conn. Gen. Life Ins. Co.*, Case No. 9:18-CV-80171, 2018 WL 6110998, at *16 (S.D. Fla. Nov. 20, 2018) ("Without any alleged conduct, there can be no implied-in-fact contract"); (*Pac. Bay Recovery, Inc. v. Cal. Physicians' Servs., Inc.*, 12 Cal.App.5th 200, 215 (Cal. Ct. App. 2017) ("Pacific Bay does not offer more detailed allegations that Blue Shield authorized a certain amount of treatment *or agreed to pay a specific rate*." [emphasis added]); *cf. Bristol SL Holdings, Inc. v. Cigna Health Life Ins. Co.,* No. SACV 19-00709 AG (ADSx), 2020 U.S. Dist. LEXIS 76342, 2020 WL 2027955, at *3 (C.D. Cal. Jan. 6, 2020) (allegations for each patient regarding the type of treatment; how long the course of treatment was expected to last; and a specific billing rate pegged to a percentage of the usual, customary and reasonable rate were found sufficient to plead a plausible claim under

*Rule 8(a)*); *California Spine & Neurosurgery Inst. v. United Healthcare Servs., Inc.,* No. 18-CV-2867 PSG (AFM), 2018 U.S. Dist. LEXIS 225961, 2018 WL 6074567, at *4 (C.D. Cal. June 28, 2018) (allegations including specific names and dates of the calls between plaintiff and defendant regarding payment for patient's services, what the services would be, and a specific price of 75% of the UCR rate until patient's MOOP expense was met and 100% of the UCR rate afterwards were found sufficient to allege that an oral contract was formed between the parties); *Out of Network Substance Use Disorder Claims,* No. SACV 19-2075 JVS (DFMx), 2020 U.S. Dist. LEXIS 81195, 2020 WL 2114934, at *8 (C.D. Cal. Feb. 21, 2020) (allegations that payment for the treatment provided to defendants' insureds would be calculated on the same terms as provided for in the policies between defendants and their insureds, specifically that payments to plaintiff would equal approximately 70% of plaintiff's fully-billed charges (based on 30% co-insurance payable by the patients), plausibly describe the services defendant promised to pay for).

More importantly, when faced with a complaint that alleges an insurer represented a specific rate of payment and provided

42

authorization to render a specific service, a plausible claim for breach of oral contract is stated (see e.g., *Aton Ctr., Inc. v. Blue Cross & Blue Shield*, Case No.: 3:20-cv-00492-WQH-BGS, 2021 U.S. Dist. LEXIS 18881, at *16 (S.D. Cal. Feb. 1, 2021) ["*Aton*"] ("The Court concludes that Plaintiff alleges a plausible claim for breach of oral contract against Defendant."). In *Aton*, the Southern District of California Court found "The factual allegations of oral contract go beyond VOB and authorization calls describing the type of treatment and a specific billing rate". (*Id. at *16*). The *Aton* Court also noted, "The Amended Complaint alleges 'a specific billing rate pegged to a percentage of the usual, customary and reasonable rate...' ". (*Id.* *15, citing *Bristol SL Holdings, Inc. v. Cigna Health Life Ins. Co.,* 2020 U.S. Dist. LEXIS 76342, 2020 WL 2027955, at *3 (C.D. Cal. Jan. 6, 2020)).

The AC alleges Aetna represented reimbursement at a specific price (a specific billing rate pegged to a percentage [80%] of Reasonable and Customary), pre-approved The Providers to perform the specific surgery rendered, and then issued payment (JA AC at ¶¶23,24,27, 41-45). Those allegations are the *prima facie* allegations for a breach of contract action in New York. "To establish a prima facie case for breach of

43

contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach" (*Natl. Mkt. Share, Inc. v Sterling Natl. Bank*, 392 F3d 520, 525 (2d Cir 2004)).

Based on those allegations, the District Court, therefore, should have determined whether the parties intended not to be bound by an oral contract. (*Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir.1985)).

## C. New York Law regarding partial performance and intention to be bound

"Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document." (*Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir.1985)). To determine if parties intend to be bound by an oral contract, a court must consider: (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually

44

committed to writing. (*Einhorn v. Mergatroyd Prods.*, 426 F. Supp. 2d 189, 193 (S.D.N.Y. 2006)).

There is nothing in the record to show Aetna reserved its right not to be bound in the absence of a writing or that these are the types of contracts usually committed to writing. It is reasonable to infer that all the terms of the agreement between the parties have been agreed upon, because Aetna accepted The Providers' performance and issued a partial payment (an 'underpayment') for that performance (JA- 69 at ¶¶41-45). There is no doubt Aetna's payment is "unequivocally referable" to the parties' agreement (see also, *S.S.I. Invs., Ltd. v Korea Tungsten Min. Co.*, 80 AD2d 155, 159-160 (1st Dept 1981) (explaining why partial payment was not enough to remove oral agreement from statute of frauds)). A partial payment is such a meaningful manifestation of an intent to contract, it removes a bar to enforcement raised by the Statute of Frauds. "[T]he weight of authority is clearly to the effect that [partial] payment will render an indivisible oral contract enforceable, notwithstanding the Statute of Frauds." (*Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 923 (S.D.N.Y. 1984), quoting *Thomaier v. Hoffman Chevrolet, Inc.*, 64 A.D.2d 492, 495-96, 410

45

N.Y.S.2d 645 (N.Y. 1978); see also, *Seven Seas Trading Co. v. Nan Hong Farm, Inc.,* No. 96 Civ. 7249 (SS), 1997 U.S. Dist. LEXIS 9290, 1997 WL 370590, at *2-3 (S.D.N.Y. July 1, 1997) (contract enforceable to extent of performance); *Starr v. Freeport Dodge, Inc.*, 54 Misc. 2d 271, 282 N.Y.S.2d 58, 59-61 (N.Y. Cnty. Dist. Ct. 1967) ($25 down payment on car sufficient to prove existence of a contract)).

Under New York Law, payment to an individual who renders a service is "an acknowledgment of the validity of the bill, implying an agreement to pay". (See, *Morrison Cohen Singer & Weinstein, LLP v Ackerman*, 280 AD2d at 355-356; *Parker, Chapin, Flattau & Klimpl v Daelen Corp.*, 59 AD2d 375, 378, 399 N.Y.S.2d 222 (1st Dept 1977)).

Aetna's partial payment of The Providers' billing "constitutes ratification of the agreement" (see, *Mulitex USA, Inc. v Marvin Knitting Mills, Inc.*, 12 AD3d 169, 170 (1st Dept 2004); *Kiss Constr., Inc. v Edison Elec. Contrs., Corp.*, 152 AD3d 575 (2d Dept 2017); see also, *Beth Isr. Med. Ctr. v Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F3d 573, 582 (2d Cir 2006) (applying New Jersey law and finding the conduct of the parties demonstrates implied-in-fact contract because payments were made)).

46

Accordingly, the District Court erred as a matter of law when it
failed to consider the AC's allegation of payment.

**D. Aetna's conduct was such that a reasonable person would
think Aetna and The Providers had reached an agreement
and that Aetna made a clear and unambiguous promise**

The District Court improperly failed to give The Providers the
benefit of the legal and factual conclusions under New York law. "In
Order to establish the existence of a contract, a party must demonstrate
that there was an offer and acceptance, in exchange for value or
consideration" (*Ellig v. Molina*, 996 F. Supp. 2d 236, 242 (S.D.N.Y.
2014)).

"[T]o make an offer[,] [a]ll that is required is conduct that would lead
a reasonable person in the other party's position to infer a promise in
return for performance." (*Einhorn v. Mergatroyd Prods.*, 426 F. Supp.
2d 189, 193 (S.D.N.Y. 2006)). We submit, by representing
reimbursement at 80 percent Reasonable and Customary "[Aetna] made
the gift of a promise in exchange for the performance of an act"
(*Petterson v Pattberg*, 248 NY 86, 88 (1928)).

The District Court found Aetna undertook no obligation to pay
anything when it made that representation. But, under New York

contract law, "[e]ven when the obligation of a unilateral promise is suspended for want of mutuality at its inception, still, upon performance by the promisee a consideration arises 'which relates back to the making of the promise, and it becomes obligatory' " (*Ryan v Kellogg Partners Inst. Servs.,* 19 NY3d 1, 14 (2012), quoting *Willetts v Sun Mut. Ins. Co.*, 45 NY 45, 47 (1871)).

   The District Court, relying on extraneous material, also found no reasonable person would have understood Aetna's representation of payment at a specific rate to be an offer or promise to pay a particular amount to The Providers (JA- 297 at p. 13). The cases cited by the District Court are not applicable to the facts of this case. First, regardless of the inference to be drawn from the use of industry words and phrases in the Call Transcript, the AC alleges the parties are participants in the health care industry: Aetna is an insurer, and The Providers are medical practices (JA 28 at ¶2 and JA-32 ¶21). The District Court, therefore, erred as a matter of law when it applied the reasonable person standard. Industry players don't speak like reasonable people speak.  As this Court has noted "the standard of the reasonable commercial person is hostile to technical interpretations and

undue emphasis on niceties of language" (*RLS Assoc., LLC v United Bank of Kuwait PLC*, 380 F3d 704, 710-711 (2d Cir 2004)). Second, the case law cited by the District Court to support is *ratio decidendi* are inapposite to the facts of this case. The Court's reliance on *Leonard v Pepsico, Inc.*, 88 F Supp 2d 116 (SDNY 1999)) was misplaced. In *Leonard* a consumer claimed a commercial that was an "obvious joke" was an offer to purchase a harrier jet for "Pepsi Points" (*id.* at 127). The *Leonard* Court dismissed the complaint because the commercial did not amount to an offer of goods; no objective person could reasonably have concluded that the commercial actually offered consumers a Harrier Jet; and that the alleged contract could not satisfy the New York statute of frauds (see, *Leonard v Pepsico, Inc.*, 210 F3d 88, 89 (2d Cir 2000)). Aetna's offer was "clear, definite, and explicit, and [left] nothing open for negotiation," in that circumstance, "it constitute[d] an offer, acceptance of which will complete the contract (*Leonard,* 88 F Supp 2d at 124). Unlike the offer in *Pepsico*, Aetna's offer was capable of being accepted, we know this because Aetna issued payment upon receipt of The Provider's billing.

The District Court also relied upon *Rightnour v. Tiffany & Co.*, 239

49

F. Supp. 3d 744 (SDNY 2017). The *Rightnour* Court determined there was no "conduct which evinces the <u>intention of the parties to contract</u>" because Rightnour had not "followed the link contained in th[e] emails" containing the offer to arbitrate her employment claims (id.)  in other words, there was no acceptance of the offer.

Under New York Law, the moment Aetna accepted the Providers' performance of the surgery a consideration arose and Aetna's representation to The Providers of reimbursement at 80 percent Reasonable and Customary became obligatory (see, *Ryan v Kellogg Partners Inst. Servs supra)*. In unilateral contracts the consideration is the performance of the specified act or acts. The performance of the act is both the acceptance of the offer and the consideration to support the offeror's promise (see, *Keuka College v. Ray*, 167 N.Y. 96 (1901); *Barnes v. Perine*, 12 N.Y. 18 (1854); *Restatement, Contracts §§ 52, 75*).

"A contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Matter of Boice*, 226 A.D.2d 908, 910, (3d Dept 1996). "(performance per the terms of the implied contract] without a written contract, is strong circumstantial proof that the

50

minds of the parties had met on the essential elements, and that they were not waiting for a formal written instrument (*Viacom Int'l Inc. v. Tandem Productions, Inc.*, 368 F. Supp. 1264 (S.D.N.Y. 1974). "Partial performance is an unmistakable signal that one party believes there is a contract, and the party who accepts performance signals, by that act, that it is also understands a contract to be in effect." *Michael Coppel Promotions Pty. Ltd. v. Bolton*, 982 F. Supp. 950, 954 (S.D.N.Y. 1997)(quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984).

Under New York Contract Law, the conduct of Aetna and The Providers evinces the intention of the parties to contract. The Providers rendered the specific surgery Aetna approved (JA- 32, 34 at ¶¶ 24, 36). Aetna did not reject the performance, but instead accepted The Providers' performance (JA- 69 at ¶¶ 41-45). Aetna then ratified the agreement by issuing payment (id.). Accordingly, the District Court erred as a matter of law by finding Aetna made no offer that the Providers accepted,

Accordingly, this Court should reinstate The Providers' claims for breach of contract, both express and implied, and Promissory Estoppel.

51

**E. The District Court erred as a matter of law when found no difference between the legal requirements for *quantum meruit* and unjust enrichment, and therefore concluded that the surgery the providers rendered had to be at Aetna's request and that the unpaid money Aetna kept in its pockets as profits was not a benefit**

The AC seeks a remedy for the benefit Aetna obtained through The Providers' labor. The money that Aetna was supposed to pay to The Providers, which it kept in its pockets as profits, was unjustly earned (JA- 38-39 at ¶67-68).

The District Court determined "there is no allegation that a service was performed at defendant's request, as the only benefit alleged to have been conferred on defendant is the surgery performed on ELS that was not alleged to have been at defendant's request" (JA- 301-302 at 18-19). The District Court misapprehended New York's law of unjust enrichment. The District Court reliance on the unreported case of *Katselnik & Katselnik, Inc. v Silverman*, 2009 NY Slip Op 32529[U] (Sup Ct, NY County 2009) is misplaced. The *Katselnick* court dismissed the unjust enrichment claim because that "defendant's dealings relating to the performance of the services were with [a non-party] rather than with the plaintiff (*id.* 2009 NY Slip Op 32529[U], at *9 ). Here, Aetna dealt directly with The Providers in arranging the surgery for E.L.S. by

52

accepting and granting The Providers request for pre-approving the surgery and then adding a different surgical facility to the authorization (JA- 32 at ¶¶23-25). These allegations give rise to a reasonable inference that Aetna and The Providers worked together for E.L.S.'s benefit.

The District Court's reliance on *Kagan v. K-Tel Ent., Inc.*, 172 A.D.2d 375 (1st Dep' t 1991) is also misplaced. First, the *Kagan* decision cited *Citrin v Columbia Broadcasting Sys., Inc.*, 29 AD2d 740 (1st Dept 1968)) in support of its proposition that "if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery (Kagan 172 AD2d at 376). *Citrin v Columbia Broadcasting Sys., Inc.*, 29 AD2d 740 (1st Dept 1968) addressed *quantum meruit* (*Citrin* 29 AD2d 740 (1st Dept 1968))

Second, The *Kagan v. K-Tel Ent., Inc.*, decision is not a statement of settled law; there is a split amongst the Appellate Divisions, First and Second Departments (see e,g., M*onex Fin. Servs. v Dynamic Currency Conversion*, 62 AD3d 675 (2d Dept 2009)). As it regards unjust enrichment, the Appellate Division, Second Department, holds that when "the plaintiff['s] cause of action did not plead a *quantum meruit*

53

theory; therefore, the plaintiffs were not required to plead that they performed services <u>for the defendants</u>"( *Monex Fin. Servs. 62 AD3d 675 at 67.*) (emphasis added), citing *AHA Sales, Inc. v Creative Bath Prods., Inc.*, 58 AD3d 6, 19 (2d Dept 2008) and comparing *Kagan v K-Tel Entertainment*, 172 AD2d 375, 376, (1st Dept 1991)).

Chief Judge Lippman of the New York Court of Appeals noted "The rule espoused in *Kagan v K-Tel Entertainment*, 172 AD2d 375, 376(1st Dept 1991)), which required that services resulting in unjust enrichment be performed at the "behest" of defendant is not the correct standard for unjust enrichment"(*Georgia Malone & Co., Inc. v Rieder*, 19 NY3d 511, 521, n 2 (2012))( Chief Judge Lippman (dissenting)).

New York Court of Appeals precedent does not require the work a plaintiff performs be done at "the behest" of the defendant. The standard for unjust enrichment enunciated by the New York Court of Appeals is "privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated" (*Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 182 (2011)) The *Wildenstein* complaint failed on its claim for unjust enrichment because of "the lack of allegations that would indicate a

54

relationship between the parties, or at least an awareness by [the defendant] of [the plaintiffs]'s existence" (*id.*). "The unjust enrichment claim does not require that the party enriched take an active role in obtaining the benefit" (*Aetna Cas. & Sur. Co. v LFO Constr. Corp.*, 207 AD2d 274, 277 (1st Dept 1994)). "[T]he relationship between [The Providers'] loss and [Aetna] gain is straightforward and proximate" (*T.D. Bank, N.A. v JP Morgan Chase Bank, N.A.*, 2010 US Dist LEXIS 109471, at *19 [EDNY Oct. 14, 2010, No. 10-CV-2843 (JG) (ARL)]). The Providers allege "Aetna's failure to pay amounts due unjustly enriched them because every dollar that Aetna didn't pay that it was obligated to pay was a dollar in Aetna's pocket as pure profit. Aetna's retention of the unpaid amount for the medical service provided is improper, and it is against equity and good conscience to allow Aetna to keep the monies it is otherwise obligated to pay" (JA- 38-39 at ¶¶67-68). "[t]he claims for restitution asserted by [The Providers] require proof of no other, independent relationship between the parties (*T.D. Bank, N.A., supra*).

The District Court also relied upon *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001) for the principle that an insurer does not benefit when services are provided to

the insured at the insured's "behest." (JA- (305 p 21). The *Losco* case did not involve healthcare services, was a claim for *quantum meruit,* and most importantly, while the insurer certainly engaged in discussions with Losco it issued payment to its insured and not Losco (*Losco Group, Inc.*, 150 F Supp at 562)

The District Court's made it absolutely clear it dismissed The Providers' unjust enrichment claims because "There is no allegation that a service was performed at defendant's request" and "conferred on defendant is the surgery performed on ELS that was not alleged to have been at defendant's request" (JA- 304 p 19). The District Court did not give The Providers the benefits of every reasonable inference, ignored allegations, and applied the incorrect law in dismissing The Providers unjust enrichment claim. Accordingly, this Court should reinstate The Providers cause of action for unjust enrichment.

**F. The District Court erred as a matter of law when it dismissed The Providers Fraudulent Inducement claim because The AC alleges facts demonstrating a fraudulent intent at the time of the representation of reimbursement at 80 percent Reasonable and Customary**

The District Court said the Providers don't explain why the why Aetna's representation of reimbursement was fraudulent(JA- 304 at

56

20). The providers allegations are sufficient for the court to have inferred that Aetna made promises it never intended to fulfill because it never intended to pay 80 percent reasonable and customary (see, *Enzo Biochem v Johnson & Johnson*, 1992 US Dist LEXIS 15723, at *41 [SDNY Oct. 14, 1992, 87 Civ. 6125 (KMW)])

The Providers allege Aetna has a scam to artificially reduce gross costs for medical services and increase its profits (JA AC at ¶48). Aetna automated its claims processing system to ensure that claims for payment received by Aetna for <u>all services</u> rendered by <u>any</u> out-of-network providers are <u>intentionally underpaid</u> (JA AC at ¶48)(emphasis added). When Aetna intentionally told The Providers that its reimbursement was based upon " 80% Reasonable and Customary" <u>Aetna knew</u> its claims processing system <u>did not allow</u> for payment using 80% Reasonable and Customary (JA- id. at ¶48)(emphasis added). The natural inference that flows from an allegation of intentional conduct that is fraudulent is one of fraudulent intent (see, *Enzo Biochem supra* ( Finding a pattern of behavior sufficient to infer fraudulent intent). There is a factual issue, therefore, whether Aetna actually used 80 percent Reasonable and Customary as a rate of

57

reimbursement when it processed and calculated its payment to The Providers.

The District Court ignored or did not credit the uncontroverted factual allegations that Aetna's representation of reimbursement at 80 percent Reasonable and Customary was intentionally fraudulent because its system was set up to never pay that rate. The District Court also failed to give The Providers the benefit of the inference that Aetna actions were intentionally fraudulent. Accordingly, this Court should reinstate the Cause of Action for Fraudulent Inducement so that discovery can be had regarding whether Aetna actually used 80 percent Reasonable and Customary as a rate of reimbursement at the time it processed The Providers' payment.

## Point III  .The Implications of the District Court's Order

Whether a healthcare provider can rely upon an insurer's representation of payment at a specific rate prior to rendering a pre-authorized service is an issue not addressed by this Court or any New York State Appellate Court. There is no precedent for the facts experienced by The Providers and if the District Court's decision is affirmed, there is no remedy either.

The implications of District Court's decision are significant. As it stand insurers can lie to a particular medical provider about making reimbursement a specific rate, pre-approve a specific service for no other purpose other than inducing the provider into rendering that service to the insurer's customer, tune their claims processing system to intentionally not pay that specific rate, underpay each and every claim where that specific rate is represented as the rate of reimbursement, and keep the difference as profits… with impunity. These are the facts before this Court.

One need not be the Mona Lisa Vito[6] of litigation to know the honest

---

[6] Mona Lisa Vito, played by Oscar winner Marisa Tomei in the 1992 20th Century Fox release *My Cousin Vinny*, is a hairdresser, ace

way to make this case a non-case is to simply establish the amount paid to The Providers was equal to the reimbursement rate represented to The Providers, which is identical to the rate called for in E.L.S.' plan. That Aetna does not make that claim should give this Court pause for concern.

As a result of the District Court's decision only when the insurer invokes the magical talisman "we promise to pay you X if you do Y" will a medical provider state a claim for legal or equitable relief.

It is not enough for the courts to say that by Aetna paying what it paid Aetna is telling the provider go to recoup the balance from the patient. The legislative materials placed before the District Court[7] explains the patient's share of the costs for out-of-network treatment is determinable only from the amount set by the insurer. Were The Providers to seek payment from E.L.S. via a lawsuit E.L.S. could and

---

mechanic, pool hall hustler, and legal strategist whose fiancé attorney qualifies her as an expert in auto mechanics to explain why the defendants' car is not identical to the actual murderers' car.

[7] Surprise Billing in Private Health Insurance: Overview of Federal Consumer Protections and payment for Out-of-Network Services R46856 July 26, 2021, Rosso Shen & Isserman Congressional Research Digital Collection

should properly claim The Providers failed to name Aetna as necessary party because E.L.S. and Aetna share the costs of health care. Additionally, E.L.S should and could properly claim The Providers failed to mitigate their damages by failing to exhaust their remedies against Aetna. We note The Providers are merely seeking what Aetna represented as the reimbursement rate, which should be identical to the rate mandated in E.L.S.' plan, and nothing more than what Aetna represented.

"In considering claims based in New York law (as here), this Court 'determine[s] *de novo* what the law of New York is.' In making that determination, this Court 'afford[s] the greatest weight to decisions of the New York Court of Appeals'" If the New York Court of Appeals has not spoken, this Court may consider lower New York court opinions as "'the best indicators'" of how the Court of Appeals might decide an issue. (*Sharp Intl. Corp. v State St. Bank & Trust Co.* (*In re Sharp Intl. Corp.*), 403 F3d 43, 49 (2d Cir 2005)). The opinions from the lower New York Courts make clear that The Providers have stated plausible claims for relief.

But in the absence of controlling precedent, we submit this Court

should adopt the rationale of the California Courts. In California, when an insurer makes an oral representation to a particular provider regarding a payment at a specific rate, pre-authorizes that provider to render a specific service to a particular insured, and that particular provider renders that specific service to the particular insured but the insurer issues payment less than the specified rate —the provider has a cause of action for breach of contract (see, *Aton Ctr., Inc. v Blue Cross & Blue Shield*, 2021 US Dist LEXIS 18881 *16 (SD Cal Feb. 1, 2021, No. 3:20-cv-00492-WQH-BGS)) (Applying California State law). Moreover, if the specific rate represented is greater than the rate specified in the particular patient's health insurance plan then the provider should have a cause of action for the greater amount (see *TML Recovery, LLC v. Humana Inc.*, 2019 U.S. Dist. LEXIS 128923, *8 (C.D. Cal. Mar. 4, 2019).

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the District Court's Judgment and remand this case back to the District Court for further proceedings.

Dated: February 15, 2024

Respectfully Submitted,

/s/Brendan J. Kearns

LEWIN & BAGLIO, LLP
By: Brendan J. Kearns
Attorneys for the Plaintiff
1100 Shames Drive
Suite 100
Westbury, New York 11590
Tel: (516) 307-1777
Fax: (516) 307-1770
L&B File No.: 2291.COM.01(F)

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because:

    This brief contains 11,913 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P32(a)(6) because:

    This brief has been prepared in Proportionally-Space typeface using Microsoft Word, in Times New Roman, Font Size 14.

Dated: February 15, 2024

**SPECIAL APPENDIX**

i

# Table of Contents

                                                                    **Page**

Opinion and Order of Honorable Jed S. Rakoff,
  Dated December 11, 2023, Appealed From.............................SPA-1

Judgment of The United States District Court for the
  Southern District of New York, Dated December 11, 2023,
  Appealed From.........................................................SPA-22

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROWE PLASTIC SURGERY OF NEW JERSEY, L.L.C., and NORMAN MAURICE ROWE, M.D., M.H.A., L.L.C., <br><br> Plaintiffs, <br><br> -v- <br><br> AETNA LIFE INSURANCE COMPANY, <br><br> Defendant. | 23-cv-8521 (JSR) <br><br> OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

On October 27, 2023, defendant moved to dismiss the Amended Complaint ("AC"). Def. Notice of Mot. to Dismiss Am. Compl., ECF No. 20. After full consideration of the parties' written submissions and oral argument, the Court hereby grants defendant's motion to dismiss with prejudice and directs the entry of final judgment.

**I.   Plaintiffs' Allegations**

Plaintiffs, Rowe Plastic Surgery of New Jersey LLC ("RPSNJ") and Norman Maurice Rowe, M.D., M.H.A., L.L.C. ("Rowe LLC"), are medical service providers. AC, ¶ 12, ECF No. 13. Dr. Norman Rowe, M.D., provides medical services through RPSNJ, and Dr. Lisa Schneider, M.D., provides medical services through Rowe LLC. Id. ¶¶ 6-7, 9-10. ELS, plaintiffs' patient, "was a candidate for

SPA-2

reduction mammaplasty," colloquially known as breast reduction surgery. Id. ¶¶ 13-14. Defendant, Aetna Life Insurance Company, was ELS's insurer. Id. ¶¶ 7 n.1, 15, 18. Plaintiffs were out-of-network providers under ELS's insurance plan. See id. ¶ 16.

On or around October 13, 2020, plaintiffs' employee called Aetna to "obtain[] insurance payment and coverage information" for ELS. Id. ¶¶ 19-20. Iris M., the Aetna employee who answered the phone, "was able to access Aetna's records to provide information concerning ELS's coverage, ELS['s] deductible limits and out-of-pocket limits and whether or not those limits had [been] met." Id. ¶ 20. Iris M. allegedly told plaintiffs' employee that Aetna "would reimburse the services rendered to ELS based upon 80% Reasonable and Customary." Id. Plaintiffs allege that they understood this to mean that defendant would reimburse them for 80% of the cost charged by other similar medical providers, within the same geographic area or market as plaintiffs, to perform a reduction mammaplasty. Id. ¶¶ 26, 28-35.

On November 2, 2020, ELS's breast reduction surgery was approved, after plaintiffs "submitted medical records to Aetna for out-of-network review." Id. ¶¶ 23-24. On November 24, 2020, Dr. Rowe and Dr. Schneider performed the breast reduction surgery on ELS. Id. ¶¶ 7, 10, 36. Plaintiffs allege that this constituted acceptance of Aetna's over the phone "offer" to reimburse them 80% of the reasonable and customary cost of the procedure. Id. ¶ 36.

2

SPA-3

However, when plaintiffs submitted a bill for $300,000 to Aetna for Dr. Rowe and Dr. Schneider's services (split evenly between the two providers), Aetna only paid $68,130.96 to plaintiff RPSNJ and $9,436.98 to plaintiff Rowe LLC. Id. ¶¶ 38, 40, 42. Plaintiffs allege that this was an underpayment under a reimbursement rate of 80% reasonable and customary. Id. ¶¶ 45, 57-61.

Plaintiffs sued defendant and asserted four causes of action: (1) breach of contract, (2) unjust enrichment, (3) promissory estoppel, and (4) fraudulent inducement. Id. ¶¶ 62-86. Plaintiffs are seeking $147,432.06 in compensatory damages as well as punitive damages and prejudgment interest. Defendant moved to dismiss the AC with prejudice.

## II.  Legal Standard

To survive a motion to dismiss for failure to state a claim, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[1] A complaint must offer more than "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007). If the plaintiffs have "not nudged their claims

---

[1] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

3

SPA-4

across the line from conceivable to plausible, their complaint must be dismissed." Id. at 570. The Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008).

Additionally, the fraudulent inducement claim here asserted is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Accordingly, to be adequately pled, the fraudulent inducement claim must "(1) specify the statements that the plaintiff[s] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lankau v. Luxoft Holding, Inc., 266 F. Supp. 3d 666, 675 (S.D.N.Y. 2017).

**III. Discussion**

The Court will first address which of the evidentiary materials that defendant has submitted in its motion to dismiss are properly considered on a motion to dismiss. Then, the Court will assess whether the claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") or are otherwise legally deficient. For the reasons discussed below, the Court finds that, although it cannot reach the ERISA preemption issue on the

SPA-5

motion to dismiss, all of plaintiffs' claims are legally deficient and must be dismissed.

### a. Evidentiary Materials

In support of its motion to dismiss, defendant submitted the summary description for ELS's insurance plan, a transcript of the October 2020 call between plaintiffs' employee and defendant's employee, Iris M., and the November 2, 2020 pre-authorization letter approving ELS's surgery. See Petrozelli Decl., Ex. A, ECF No. 22-1; Petrozelli Decl., Ex. B, ECF No. 22-2; Petitt Decl., Ex. A, ECF No. 21-1. Plaintiffs argue that none of the documents is properly before the Court on the motion to dismiss.

A complaint is deemed to contain a document if any one of three conditions is satisfied. First, the complaint may attach the document or incorporate it by reference. Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995). Second, the complaint may "rel[y] . . . upon its terms and effect" to such an extent that the document is "integral" to the complaint. Id. See also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). Third, the document may be subject to judicial notice. See Fed. R. Evid. 201(b) (Judicial notice may be taken of facts that are either "generally known within the trial court's territorial jurisdiction" or that "can be accurately and readily determined from sources whose accuracy cannot be questioned.").

5

SPA-6

Applying these standards, the Court concludes it may properly consider the transcript of the October 2020 call but not the other documents. The October 2020 call is plainly integral to the AC, as the AC relies upon the "terms and effect" of the phone call as the basis for the entire lawsuit. See AC, ¶¶ 27, 43, 57-61, 71, 74-80, 82-86; Int'l Audiotext Network, 62 F.3d at 72. Plaintiffs do not attempt to dispute that the phone call is integral to the AC or that the transcript is unreliable. Instead, plaintiffs argue that the transcript of the call is inadmissible and cannot be considered because defendant did not lay the proper foundation to invoke the hearsay exception for business records. Even assuming arguendo that the Court may only consider admissible evidence on a motion to dismiss, defendant has fully laid the foundation that the phone call is a business record. A declaration from a senior paralegal of defendant indicates the phone call "was recorded and maintained in the normal course of Aetna's business." Petrozelli Decl., ¶ 3. That is sufficient foundation. United States v. Komasa, 767 F.3d 151, 156 (2d Cir. 2014) ("To lay a proper foundation for a business record, a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular

SPA-7

practice of that business activity to make the record.").[2] Accordingly, the Court will consider the transcript of the phone call when assessing the sufficiency of the AC.

However, the Court will not consider the November 2020 pre-authorization letter. The pre-authorization letter is not attached to the complaint nor is the pre-authorization letter subject to judicial notice. That leaves two other possible options: that the letter is incorporated by reference, or it is integral to the complaint. "To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the document[]." Lateral Recovery, LLC v. Cap. Merch. Servs., LLC, 632 F. Supp. 3d 402, 440 (S.D.N.Y. 2022). But the AC only references the pre-authorization letter once, see AC, ¶ 24, which is insufficient for incorporation by reference, see Lateral Recovery, 632 F. Supp. 3d at 440. Nor can it be said that the letter is integral to the AC, as the AC does not "rel[y] . . . upon its terms and effect" for any of the causes of action that are asserted against defendant. See Int'l Audiotext Network, Inc., 62 F.3d at 72. Thus, the letter is not properly considered on the motion to dismiss.

---

[2] Furthermore, the statements of plaintiffs' employee, contained in the document, are admissible under Federal Rule of Evidence 801(d)(2)(D).

SPA-8

Finally, the Court will not consider the summary of ELS's insurance plan. Neither party argues that the Court can take judicial notice of the plan, that the plan is attached to the complaint, or that the plan is incorporated by reference. The parties do, however, dispute whether the plan is integral to the AC. Defendant argues that the plan is integral to the AC because "E.L.S. was enrolled in the [p]lan" and "Aetna's communications to [p]laintiffs about the [p]lan terms, specifically the October 14, 2020 benefits verification call, and, indeed, the [p]lan's terms themselves are at the very heart of [p]laintiffs' claims." Def. Reply Mem. of Law in Further Supp. of Mot. to Dismiss, at 7, ECF No. 27. Plaintiffs, on the other hand, argue that they did not "rel[y] on the terms and effect of [the plan] in drafting [their] complaint," Chambers, 282 F.3d at 153, because they are seeking to enforce an oral promise that is not a term in the plan and the AC would state a claim to relief without any references to ELS's plan.

Plaintiffs have the better of the arguments, as defendant's position is based on an over-reading of the AC. The AC does not once mention ELS's insurance plan or quote from it. Instead, the AC only contains oblique references to ELS's insurance plan. In particular, the AC alleges that "ELS are the initials of a consumer of Aetna's health insurance products," and around October 13, 2020, plaintiffs' employee "contacted Aetna" to "obtain[] insurance payment and coverage information." AC, ¶¶ 7 n.1, 19. Defendant's

employee, Iris M., then allegedly indicated that he "was able to
access Aetna's records to provide information concerning ELS'[s]
coverage, ELS['s] deductible limits and out-of-pocket limits and
whether or not those limits had been met" and "represented that
[Aetna] would reimburse the services rendered to ELS based upon
80% Reasonable and Customary." Id. ¶ 20. Despite defendant's best
efforts, the allegations in the AC do not allege that the
representation about the reimbursement rate was based on the plan,
nor does the AC anywhere allege that ELS was part of an ERISA plan
that Aetna administers. If "[m]erely mentioning a document in the
complaint" or "offering limited quotations from [a] document is
not enough" for a document to be integral to a complaint, Goel v.
Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016), then surely the
allegations in the AC, which do not even reference or quote from
the plan, are insufficient to show that plaintiffs "reli[ed] on
the terms and effect of [the summary of ELS's plan] in drafting
[their] complaint." Chambers, 282 F.3d at 153. This is especially
so because the entire thrust of the AC is based on the alleged
oral representation that plaintiffs would be reimbursed at 80%
reasonable and customary. See AC, ¶¶ 27, 43, 57-61, 71, 74-80, 82-
86. The Court thus will not consider the summary of the plan on a
motion to dismiss.

### b. ERISA Preemption

Under Section 514(a) of ERISA, "any and all State laws insofar as they may now or hereafter relate to any employment benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title" are preempted. 29 U.S.C. § 1144(a). Defendant argues that all of plaintiffs' claims are preempted by ERISA. Accordingly, if it is clear from the AC and the transcript of the call that ELS had an insurance plan governed by ERISA, then the Court would be required to undertake a preemption analysis. However, the AC does not once mention ERISA or that ELS had an insurance plan governed by ERISA. Nor does the transcript of the October 14, 2020 call indicate that ELS had a plan governed by ERISA. See Petitt Decl., Ex. A. Only the summary of ELS's plan, which the Court cannot consider, indicates that ELS's plan is governed by ERISA. See Petrozelli Decl., Ex. A, at 112-14, 120. Because there is no proper evidence before the Court that ELS's plan is governed by ERISA, it would be premature for the Court to engage in a preemption analysis.

### c. Legal Adequacy

ERISA quite aside, defendant argues that all of plaintiffs' claims are legally defective and should be dismissed. The Court agrees.

10

SPA-11

### i. Breach of Contract

"To state a claim in federal court for breach of contract under New York law, a complaint need[s] [to] allege (1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of contract by the defendant, and (4) damages." DeFlora Lake Dev. Assocs., Inc. v. Park, 654 F. App'x 9, 10 (2d Cir. 2016). "An agreement generally requires an offer and an acceptance." McCabe v. ConAgra Foods, Inc., 681 F. App'x 82, 84 (2d Cir. 2017). See also Ellig v. Molina, 996 F. Supp. 2d 236, 242 (S.D.N.Y. 2014) ("In order to establish the existence of a contract, a party must demonstrate that there was an offer and acceptance, in exchange for value -- or consideration."). "[A] breach of contract claim that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal." Lamda Sols. Corp. v. HSBC Bank, USA, N.A., 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021).

Plaintiffs' breach of contract claim centers on the statement that defendant's employee made on the October 14, 2020 call. See AC, ¶¶ 20, 59. Plaintiffs allege that this was a unilateral offer of 80% reimbursement that plaintiffs accepted by performing the surgery on ELS. Id. ¶¶ 27, 36. Defendant, however, argues that the transcript of the call demonstrates that Aetna's employee did not make an offer to pay 80% reasonable and customary but instead was merely explaining the reimbursement methodology under ELS's plan.

11

SPA-12

Because, as previously noted, the transcript of the call is properly considered on the motion to dismiss, the Court is not bound by the plaintiffs' allegation that the representation was a unilateral offer. Instead, the transcript of the October 14, 2020, phone call "control[s]." Tongue v. Sanofi, 816 F.3d 199, 206 n.6 (2d Cir. 2016). See also Midwest Operating Eng'rs Pension Tr. Fund v. Alkermes Pub. Ltd. Co., No. 21-801-cv, 2021 WL 5782079, at *3 n.7 (2d Cir. Dec. 7, 2021). Accordingly, the Court will review the transcript of the call to determine whether the representation that plaintiffs allege was a unilateral offer is legally characterized as such.

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Lamda Sols. Corp., 574 F. Supp. 3d at 214 (quoting Restatement (Second) of Contracts § 24 (1981)). "[T]o make an offer[,] [a]ll that is required is conduct that would lead a reasonable person in the other party's position to infer a promise in return for performance." Einhorn v. Mergatroyd Prods., 426 F. Supp. 2d 189, 193 (S.D.N.Y. 2006). The parties' subjective intent is irrelevant. See Leonard v. Pepsico, Inc., 88 F. Supp. 2d 116, 127 (S.D.N.Y. 1999), aff'd, 210 F.3d 88 (2d Cir. 2000); Rightnour v. Tiffany & Co., 239 F. Supp. 3d 744, 752 (S.D.N.Y. 2017).

12

SPA-13

Here, the transcript of the October 14, 2020 call clearly shows that defendant's employee did not make an offer. At the start of the call, plaintiffs' employee states that she "would like the benefits" for ELS "for outpatient surgery done in a hospital and billing as professional." Petitt Decl., Ex. A, at 2:16-18. Defendant's employee then goes on to recount, in detail, ELS's plan benefits: (1) "the outpatient surgery center for ambulatory" would "be covered at 100 percent" without a deductible or copay; (2) ELS's "out-of-pocket for in-network" is "4500" (only $170.69 of which had been met); (3) "out-of-network coinsurance" is "70 percent" after ELS's $3,000 deductible; and (4) ELS's "out-of-pocket for out-of-network" is $6,000 (only $178.69 of which had been met). Id. at 3:11-4:25. Only after receiving all of that information did plaintiffs' employee ask "what is the reimbursement rate? Reasonable on customary or Medicare?"; defendant's employee checked and then responded, "for the reimbursement rate, it's going to be 80 percent reasonable and customary." Id. at 5:1-9. It is thus plain from the transcript of the call that defendant's employee was merely recounting ELS's scope of coverage and benefit rates. No reasonable person would understand that representation to be an offer or promise to pay a particular amount to plaintiffs. See TML Recovery, LLC v. Humana, Inc., No. 18-cv-00462, 2019 WL 3208807, at *4 (C.D. Cal. Mar. 4, 2019) ("within the medical insurance industry, an insurer's

13

verification is not the same as a promise to pay"). Nor can allegations related to plaintiffs' subjective understanding that this representation was a unilateral offer change the analysis, as subjective intent is completely irrelevant. See Leonard, 88 F. Supp. 2d at 127; Rightnour, 239 F. Supp. 3d at 752.[3]

Because no reasonable person would understand the representation about the reimbursement rate to be an offer to pay and the AC does not allege any other offer as the basis for its breach of contract claim, the breach of contract claim must be dismissed.

**ii. Promissory Estoppel**

To adequately plead a promissory estoppel claim, the complaint "must allege 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the

---

[3] Plaintiffs submitted a declaration from Michael Manzo, presumably to bolster and supplement the allegations made in the AC. See Manzo Decl., ECF No. 25. The Court will not consider this declaration or its additional factual allegations because it would be improper to do so. See Maricultura Del Norte v. World Bus. Cap., Inc., 159 F. Supp. 3d 368, 376 (S.D.N.Y. 2015) ("The contents of such documents may not be considered in ruling on the instant motion, as a plaintiff may not supplement a deficient pleading through additional facts contained in affidavits."), aff'd sub nom. Maricultura Del Norte, S. de R.L. de C.V. v. Umami Sustainable Seafood, Inc., 769 F. App'x 44 (2d Cir. 2019); Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A., 650 F. Supp. 3d 62, 86 (S.D.N.Y. 2023) ("It is well established in this district that a plaintiff cannot amend his pleadings in his opposition briefs.").

SPA-15

promise is made; and an injury sustained by the plaintiff[s].'"
Cambridge Cap. LLC v. Ruby Has LLC, 565 F. Supp. 3d 420, 457
(S.D.N.Y. 2021) (quoting Cyberchron Corp. v. Calldata Sys. Dev.,
Inc., 47 F.3d 39, 44 (2d Cir. 2015)). "A promise that is too vague
or too indefinite is not actionable under a theory of promissory
estoppel." Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC,
No. 22-cv-9766, 2023 WL 4211035, at *12 (S.D.N.Y. June 27, 2023).

Plaintiffs' promissory estoppel claim relies on the same
representation as the breach of contract claim: that "Aetna made
a clear and definite promise to reimburse the medical services
provided by [plaintiffs] to ELS at 80% Reasonable and Customary."
AC, ¶ 74. As explained above, the Court is not bound by these
allegations, as the transcript of the actual phone call is properly
considered on the motion to dismiss. See Tongue, 816 F.3d at 206
n.6. The full statement that defendant's employee made is: "So for
the reimbursement rate, it's going to be 80 percent reasonable and
customary." Petitt Decl., Ex. A at 5:6-7. There is no language
indicating that defendant's employee undertook an obligation or
promised to pay a particular amount. Instead, context makes plain
that defendant's employee was merely reciting the benefits
available if plaintiffs performed the breast reduction surgery on
ELS, not promising to pay plaintiffs a particular amount if the
surgery was in fact performed. See TML Recovery, 2019 WL 3208807,

at *4. Accordingly, the promissory estoppel claim must be dismissed because defendant did not make a clear and unambiguous promise.

### iii. Unjust Enrichment

"To state a claim for unjust enrichment under New York law, a plaintiff must plead facts showing that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Mount v. PulsePoint, Inc., 684 F. App'x 32, 36 (2d Cir. 2017). Plaintiffs' theory undergirding this claim is that defendant was able to earn a higher profit, because defendant underpaid plaintiff, and it would be unjust for defendant to retain those ill-gotten profits. See AC, ¶¶ 67-68. Defendant argues that the AC fails to adequately allege an unjust enrichment claim. The Court once again agrees with defendant.

To prevail on an unjust enrichment claim, "a party must establish that it conferred a benefit upon the other party, and that the party will retain that benefit without adequately compensating the first party therefor." Nasca v. Greene, 187 N.Y.S.3d 773, 775 (2d Dep't 2023). See also Nakamura v. Fujii, 677 N.Y.S.2d 113, 116 (1st Dep't 1998) ("To state a cause of action for unjust enrichment, a plaintiff must allege that it conferred a benefit upon the defendant, and that the defendant will obtain such benefit without adequately compensating plaintiff

therefor."); M+J Savitt, Inc. v. Savitt, No. 08 Civ. 8535, 2009 WL
691278, at *10 (S.D.N.Y. Mar. 17, 2009) ("To bring [an unjust
enrichment] claim, the plaintiff must have bestowed the benefit on
the defendant."). Here, the only benefit allegedly conferred on
defendant is the surgery plaintiffs performed on ELS. See AC, ¶ 70
("The benefit conferred upon Aetna was the benefit of its bargain,
bilateral breast reduction and other medical services rendered to
ELS."). But that is not a benefit that inured to defendant. See
Travelers Indem. Co. of Conn. v. Losco Grp., Inc., 150 F. Supp. 2d
556, 563 (S.D.N.Y. 2001) ("It is counterintuitive to say that
services provided to an insured are also provided to its insurer.
The insurance company derives no benefit from those services;
indeed, what the insurer gets is a ripened obligation to pay money
to the insured -- which hardly can be called a benefit."). That is
solely a benefit conferred on the patient, which is legally
insufficient to allege an unjust enrichment claim.

Relatedly, the unjust enrichment claim is also deficient
because there is no allegation a service was provided to defendant
at defendant's request, as is required under New York law. See,
e.g., Katselnik & Katselnik, Inc. v. Silverman, No. 111147/2008,
2009 WL 3713145 (N.Y. Sup. Ct. Oct. 13, 2009) ("[T]o prevail on .
. . an unjust enrichment claim . . . [p]laintiff would also have
to establish that the services were performed for the defendant.
. . . if services were performed at the behest of someone other

17

SPA-18

than the defendant, the plaintiff must look to that person for recovery."); Kagan v. K-Tel Ent., Inc., 172 A.D.2d 375, 376 (1st Dep't 1991) ("to recover under a theory of quasi contract, a plaintiff must demonstrate that services were performed *for the defendant* resulting in its unjust enrichment"); Josephson v. United Healthcare Corp., No. 11-CV-3665, 2012 WL 4511365, at *5 (E.D.N.Y. Sept. 28, 2012) (dismissing a medical providers' unjust enrichment claim against an insurer because the medical "services were performed at the behest of [the medical providers'] patients, not United.").[4] There is no allegation that a service was performed at defendant's request, as the only benefit alleged to have been

_____

[4] Plaintiffs attempt to counter that this requirement applies only to quantum meruit claims. That completely ignores that the cited cases apply this requirement to unjust enrichment claims. It also overlooks the well-established principle that "[a]lthough their elements are articulated somewhat differently, New York law permits analyzing quantum meruit and unjust enrichment together as a single quasi contract claim." Nwoye v. Obama, 22-CV-1791, 2023 WL 4631712, at *11 (S.D.N.Y. July 20, 2023). See also Unicorn Crowdfunding, Inc. v. New St. Enter., Inc., 507 F. Supp. 3d 547, 575-76 (S.D.N.Y. 2020); Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005). It is thus a distinction without a difference.

conferred on defendant is the surgery performed on ELS that was not alleged to have been at defendant's request. See AC, ¶ 70.

For each and both these reasons, the unjust enrichment claim must be dismissed.

### iv. Fraudulent Inducement

To make out a claim for fraudulent inducement, "plaintiff[s] must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff[s] reasonably relied; and (5) which caused injury to plaintiff[s]." President Container Grp. II, LLC v. Systec Corp., 467 F. Supp. 3d 158, 165 (S.D.N.Y. 2020) (quoting Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001)). Here, defendant argues that the fraudulent inducement claim must be dismissed because it is inadequately pled under Federal Rule of Civil Procedure 9(b). The Court agrees.

Because plaintiffs' fraudulent inducement claim is subject to Federal Rule of Civil Procedure 9(b), the AC must include allegations that "explain why the statement[] w[as] fraudulent." Lankau, 266 F. Supp. 3d at 675. Here, plaintiffs' complaint entirely fails to do so. The central allegation is that defendant "intentionally misrepresented . . . that its reimbursement was based on 80% Reasonable and Customary." AC, ¶ 82. The only

SPA-20

allegation in the AC about why this was statement was fraudulent is that defendant "knew its claims processing system did not allow for payment using 80% Reasonable and Customary." Id. ¶ 83. However, that allegation, in and of itself, does not adequately allege why the statement was fraudulent. Whether a processing system permits a certain amount of reimbursement does not indicate that defendant could not and would not pay the represented reimbursement amount. The allegations are therefore insufficient under Federal Civil Rule 9(b). The fraudulent inducement claim must therefore be dismissed.

### d. Leave to Amend

Defendant requests that the Court dismiss the AC with prejudice. Plaintiffs, for their part, have not sought leave to amend nor indicated how any amendment could fix the deficiencies with the AC, most of which are legal deficiencies that no conceivable amendment could fix. Because plaintiffs have already amended their complaint once, have not sought leave to amend their complaint again, and have not explained how any of the glaring legal deficiencies with their complaint can be fixed, the Court

SPA-21

will dismiss the AC with prejudice. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1132 (2d Cir. 1994).

IV. **Conclusion**

For the reasons explained above, the Court hereby dismisses the AC with prejudice. The Clerk of Court is directed to enter judgment, dismissing the case with prejudice and in its entirety.

New York, NY
December _11_, 2023

JED S. RAKOFF, U.S.D.J.

SPA-22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
ROWE PLASTIC SURGERY OF NEW JERSEY, L.L.C.,
and NORMAN MAURICE ROWE, M.D., M.H.A., L.L.C.,

                Plaintiff,

     -against-                           23 **CIVIL** 8521 (JSR)

                                             **JUDGMENT**

AETNA LIFE INSURANCE COMPANY,

                Defendant.
------------------------------------------------------------------------X

       It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated December 11, 2023, Defendants' motion to dismiss

amended complaint is GRANTED with prejudice.

**Dated:** New York, New York

      December 11, 2023

                               **RUBY J. KRAJICK**
                                   _____
                                     Clerk of Court

             **BY:**

                                 **Deputy Clerk**